UNITED STATES DISTRICT COURT        b
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| GARY LYNN BELLARD | CIVIL ACTION NO. 2:16-CV-01711 |
| VERSUS | JUDGE TRIMBLE |
| NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY | MAGISTRATE JUDGE PEREZ-MONTES |

REPORT AND RECOMMENDATION

I. Background.

A. Procedural History

Gary Lynn Bellard ("Bellard") filed an application for Social Security disability insurance benefits ("DIB") on February 1, 2014, alleging a disability onset date of July 15, 2013 (Doc. 7-1, p. 133/341) due to thoracic back injury, spine, ribs, nerve damage; spinal arthritis; degenerative disc disease; depression, dislocated clavicle injury; cervical fusion; and back scapula surgery (Doc. 701, p. 150/341).

A *de novo* hearing was held before an Administrative Law Judge ("ALJ") on April 9, 2015, at which Bellard appeared with his attorney and a vocational expert ("VE") (Doc. 7-1, pp. 28-29). The ALJ found that Bellard last met the insured status requirement for DIB on December 31, 2013 (Doc. 7-1, p. 17/341). The ALJ further found that, although Bellard suffers from a severe impairment of herniated disc at T10-11, he had the residual functional capacity to perform the full range of medium work on the date he was last insured (Doc. 701, pp. 17, 19/341). The ALJ concluded

that Medical-Vocational Guidelines Rule 203.22 directed a finding of "not disabled" (Doc. 7-1, p. 25/341).

Bellard requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 7-1, p. 8/341).  The ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Bellard next filed this appeal for judicial review of the ALJ's decision.  Bellard raises the following issues for review on appeal (Doc. 10):

1. Did the ALJ fail to develop the medical record by not requesting further clarification from the treating physicians when it was determined that their reports did not fully address a critical issue?

2. Was the ALJ's decision supported by substantial evidence when she used the opinion of a non-treating, non-examining State consultant instead of the treating physicians?

3. Should the ALJ have recognized the retrospective evidence (evidence developed after Date Last Insured) which was the strongest evidence on a critical issue?

The Commissioner filed a response (Doc. 11), to which Bellard replied (Doc. 12). Bellard's appeal is now before the Court for disposition.

B. <u>Medical Records</u>

In November 2011, Bellard was examined by Dr. Susan Ieyoub (Doc. 7-1, p. 266/341).  Bellard reported he had fractured two ribs (with inflammation) near the insertion by the spine, in a 2009 car accident, and had arthritic changes, which caused pain (Doc. 7-1, pp. 222, 259, 266/341).  Bellard had a steroid injection that did not relieve his pain, and two temporary nerve blocks that made him feel better overall by reducing the intensity of his pain (Doc. 7-1, p. 266/341).  Bellard reported having to

limit his work due to his symptoms (Doc. 7-1, p. 266/341).  Bellard was 5'7" tall and weighed 216 pounds, and his blood pressure was 132/82 (Doc. 7-1, p. 266/341).  Dr. Ieyoub diagnosed malaise, hypertension, mixed hyperlipidemia, and backache NOS (Doc. 7-1, p. 267/341.

In May 2012, Dr. Ieyoub noted Bellard had ongoing thoracic pain, so they the discussed the possibility of a permanent nerve block (Doc. 7-1, p. 259/341).  In December 2012, Bellard reported a nerve block administered in November had lasted only nine days, but his best nerve block had lasted about four months (Doc. 7-1, p. 256/341).  Bellard said he had "shock-like" pain about 50 times a day (Doc. 7-1, p. 256/341).  Bellard also said he had thoracic pain with deep breaths and changes in position, so pain awakened him at night if he changed position (Doc. 7-1, p. 256/341).

In December 2012, Bellard had another nerve block that relieved his pain until about March, when his pain returned, but this time without radiculopathy (Doc. 7-1, p. 253/341).  Bellard considered getting another injection to see if he would have complete relief (Doc. 7-1, p. 253/341).

In September 2013, Dr. Ieyoub again evaluated Bellard's complaints of thoracic pain (Doc. 7-1, p. 220/341).  Bellard reported right-sided paraspinous pain in his low thoracic region (Doc. 7-1, p. 222/341).  The pain kept him up at night (Doc. 7-1, p. 222/341), and he was experiencing anxiety, depression, irritability, and stress (Doc. 7-1, p. 250/341).  Bellard had moderate tenderness at T8, T9, and T10 (Doc. 7-1, p. 222/341), and posterior thoracic pain on full right lateral rotation (Doc. 7-1, p. 222/341).  Bellard had received multiple injections including nerve blocks that only

helped for a short period of time (Doc. 7-1, p. 213/341). Hydrocodone was also not giving him relief and he was unable to tolerate Cymbalta, so Dr. Ieyoub prescribed a Fentanyl patch (Doc. 7-1, p. 250/341). A previous CT scan showed multiple levels of degenerative changes in his T-spine, the most notable of which was arthrosis on the right at T10 (Doc. 7-1, p. 222/341).

Bellard next had an MRI examination of his thoracic spine in September 2013 that showed very small disc bulges and mild facet arthropathy scattered along the thoracic spine with a tiny posterior right paramedian disc herniation at T10-T11 (Doc. 7-1, p. 213/341). There was no spinal canal narrowing, no cord deformation, and no significant foraminal narrowing (Doc. 7-1, p. 213/341). The MRI also showed spondylotic changes and facet arthropathy along the visualized lower cervical spine with a Grade I retrolisthesis of C6 upon C7 that caused mild spinal canal narrowing but no cord deformation (Doc. 7-1, p. 213/341). Following the MRI, Dr. Ieyoub found it was likely his pain was from the bony arthrosis with overgrowth stemming from his previous rib fractures (Doc. 7-1, p. 226/341). Hydrocodone was no longer giving Bellard relief, so Dr. Ieyoub prescribed a fentanyl patch (Doc. 7-1, p. 250/341) and discussed pain management (Doc. 7-1, p. 250/341).

In October 2013, Bellard reported the fentanyl patch and Norco were relieving his pain somewhat (Doc. 7-1, p. 247/341). Bellard received a right T10 transforaminal epidural steroid injection for his right lumbar radiculopathy (Doc. 7-1, p. 216/341). However, steroid injections did not alleviate Bellard's pain (Doc. 7-1, p. 230/341). Dr. Ieyoub was unable to identify the source of his pain, but suspected intercostal nerve

pain (Doc. 7-1, p. 230/341).  Dr. Ieyoub diagnosed depression; insomnia; thoracic disc disorder; mixed hyperlipidemia; hypertension; backache; cardiac murmur; cardiac dysthythmia; malaise; and erectile dysfunction (Doc. 7-1, p. 245/341).

In February 2014, Dr. Ieyoub noted Bellard's surgery consult had told him surgery was possible but there was no guarantee about the outcome (Doc. 7-1, p. 241/341).  Bellard was taking hydrocodone as needed for pain (Doc. 7-1, p. 241/341). Bellard was 5'6", weighed 222 pounds, and his blood pressure was 138/82 (Doc. 7-1, p. 242/341).  Dr. Ieyoub found Bellard was suffering from depression; insomnia; mixed hyperlipidemia; hypertension; backache NOS; cardiac murmur; malaise; and erectile dysfunction (Doc. 7-1, p. 243/341).

In August 2014, Dr. Esses (in Houston) carried out a right T10-11 decompressive laminectomy, and a discectomy was also performed on a large disc herniation (Doc. 7-1, pp. 296, 300, 334, 339/341).  Dr. Esses noted there was very profound stenosis with nerve root compression, but the decompression was uncomplicated (Doc. 7-1, p. 334/341).  Three weeks later, Bellard was doing better physically and mentally, and was tapering off his pain medication (Doc. 7-1, p. 300/341).  After the staples were removed, Bellard developed a surgical site wound infection and a "sharp edge" sensation (Doc. 7-1, pp. 293, 296/341).  After the infection resolved, the "sharp edge" sensation remained (Doc. 7-1, p. 293/341).  Thoracic x-rays showed multilevel osteophytosis, degenerative changes of the visualized cervical spine, and a fusion at C4-5 (Doc. 7-1, p. 295/341).

In September 2014, Bellard reported muscular pain in his back, and Dr. Esses recommended he start working out, including stretching (Doc. 7-1, p. 332/341).

C.    <u>Administrative Hearing</u>

At his April 2015 administrative hearing, Bellard was 56 years old, and had been the working owner of a sheet metal air conditioning business for 15 years (Doc. 7-1, p. 34/341).  Bellard was self-employed until 2009 (Doc. 7-1, p. 35/341).  Bellard worked on air conditioning and refrigeration sheet metal, mostly for restaurant equipment (Doc. 7-1, p. 34/341).  Bellard's work involved welding sheet metal and doing the whole spectrum of refrigeration work (Doc. 7-1, pp. 35-36/341).  Bellard also did installation work for many years through a restaurant supply company (Doc. 7-1, p. 36/341).  Bellard's work involved using dollies to move equipment and materials weighing several hundred pounds (Doc. 7-1, p. 36/341).

Bellard testified that he lived with his wife and two children (Doc. 7-1, p. 35/341).  Bellard completed high school and welding school (Doc. 7-1, p. 35/341).

Bellard testified that he stopped working in 2009 because he was in a car accident and began having back problems (Doc. 7-1, p. 37/341).  He continued to do some work, but could no longer install hoods or anything else heavy because he could no longer handle them (Doc. 7-1, p. 37/341).  Bellard did some repair and service work on air conditioning and small jobs for restaurants until he had to quit working altogether in July 2013 (Doc. 7-1, p. 37/341).  Bellard has not had any income since July 2013 (Doc. 7-1, p. 37/341).

Bellard testified that he had surgery in August 2014 (Doc. 7-1, p. 38/341).  The surgeon "repaired a disc" and removed a bone spur behind his ribs (Doc. 7-1, p. 38/341).  Since the surgery, Bellard's nerve pain is better, and his other issues are not as severe or as frequent (Doc. 7-1, p. 38/341).  Bellard still has severe pain in his back when he bends his thoracic area (Doc. 7-1, p. 38/341).  His back pain is more severe with bending or activity (Doc. 7-1, p. 39/341).

Before the surgery, Bellard had a radiating, shocking pain that would shoot from his spine all the way around his rib cage and underneath his front chest area (Doc. 7-1, p. 39/341).  That area has been better since the surgery (Doc. 7-1, p. 39/341).  However, eight or ten times a day, Bellard still gets shooting pains, about eight to 10 times in a row, but the pain only lasts a few minutes since the surgery, instead of an hour as before (Doc. 7-1, p. 39/341).  Bellard further testified that raising his arms about shoulder height pulls his back (Doc. 7-1, p. 40/341).

Bellard testified that had a previous cervical fusion and continues to have residual neck pain, but he was always able to work with that (Doc. 7-1, pp. 34, 40/341).

Since his thoracic surgery, Bellard gets up early, lays on the couch, reads the paper, and then uses his computer or iPad (Doc. 7-1, p. 40/341).  Bellard has difficulty sleeping because he has back pain when he moves or rolls over, so he gets up and stretches (Doc. 7-1, pp. 40-41/341).  Bellard testified that he does not do a lot of chores around the house, but he did not do many chores before he injured his back (Doc. 7-1, p. 41/341).  Bellard cooks his breakfast when he gets up (Doc. 7-1, p. 41/341).  He does not do any yard work, so his son and wife take care of it (Doc. 7-1, p. 41/341).  He

can stand at the stove for a short period of time (Doc. 7-1, p. 41/341).  Bellard goes to church, sits in a chair instead of in a pew, and leaves early if he gets too uncomfortable (Doc. 7-1, pp. 41-42/341).  Bellard is able to go grocery shopping as long as he can lean on the cart and is not there more than about 20 minutes (Doc. 7-1, pp. 41, 49/341).  Bellard is tired after a shopping trip, so he lies down for about an hour (Doc. 7-1, p. 42/341).  Bellard used to hunt and fish before he injured his back in 2009, but stopped because he can no longer walk for very long (Doc. 7-1, p. 43/341).  Bellard testified that he drives, but sometimes has to pull over to change positions to relieve pressure and pain (Doc. 7-1, p. 43/341).  Ballard occupies some of his time by using his iPad or watching TV, but does not do that all day (Doc. 7-1, p. 49/341).

Bellard testified that he takes blood pressure medicine, Hydrocodone (3 times a day), Gabapentin (4 to 5 times a day), and vitamins (Doc. 7-1, p. 43/341).  The medications makes his symptoms less severe, but they do not go away completely (Doc. 7-1, p. 44/341).  Bellard does not have side effects from his medications (Doc. 7-1, p. 44/341).  Bellard used a TENS unit a lot prior to his surgery (Doc. 7-1, p. 44/341).  Since his thoracic surgery, Bellard only uses a TENS unit occasionally (zero to three days per week) because he is not having as much "shocking" pain as he had prior to the surgery (Doc. 7-1, p. 45/341).

Since his surgery, Bellard can stand/walk for 20 to 30 minutes before he needs to stop and take a break (Doc. 7-1, p. 45/341).  When he is standing, he is usually leaning on something (Doc. 7-1, p. 46/341).  If he has a spasm, or "shock," he has to sit in a chair to stretch his back and move it (Doc. 7-1, p. 64/341).  Bellard can sit

comfortably in a straight chair or ride in a car for about 40 minutes (Doc. 7-1, pp. 45-46/341).  Bellard testified the heaviest thing he can lift/carry is a gallon of milk (Doc. 7-1, p. 46/341).  Bellard cannot bend from the waist forward, so he uses a tool to reach and pick things up (Doc. 7-1, p. 47/341).  Bellard can bend at his knees, and can bend somewhat at his waist (though not enough to make it to the ground) but he cannot bend in his thoracic area (Doc. 7-1, p. 47/341).  Bellard testified that he was able to walk up three or four steps to get into the building where the hearing was held, but he is no longer able to climb ladders and scaffolds (Doc. 7-1, p. 47/341).  Bellard lies down at least three or four times each day, for up to an hour each time (Doc. 7-1, p. 48/341).

Bellard described the "hurting" pain in his back as an 8.5 or 9 and nearly constant because it occurs whenever he moves his torso or takes a step (Doc. 7-1, pp. 50/341).  Bellard testified the "hurting" pain is more prominent now since the "shocking, electrical" pain is less frequent (Doc. 7-1, pp. 51/341).  Bellard testified that, from 2009 to 2013, he only did very minor jobs involving air conditioner repairs (Doc. 7-1, p. 49/341).  Bellard was getting spinal injections during that time, which gave him short-lived relief (Doc. 7-1, pp. 49-50/341).

The VE testified that Bellard's past work as a "sheet metal shop supervisor" was medium work, SVP 8, DOT 809.130-014, but that the work was heavy to very heavy as Bellard performed it (Doc. 7-1, p. 53/341).  The VE further stated that Bellard's skills are probably at a 10 (Doc. 7-1, p. 53/341).

The VE testified that such a person would have skills that would transfer to: (1) building installation supervisor (light work, 7 SVP, DOT 863.134-010, 1,200 jobs in the United States and 25 jobs in Louisiana); (2) fence erector supervisor (light work, 7 SVP, DOT 869.134-010, 309 jobs in the United States and 7 in Louisiana); and (3) concrete mixing supervisor (light work, 7 SVP, DOT 853.137-010, 5,500 jobs in the United States and 117 in Louisiana (Doc. 7-1, p. 54/341).[1]

The VE further testified that Bellard's transferrable skills are understanding and following blueprints, sketches, drawing, or other written specifications; working to precise measurements; the ability to use arithmetic to measure and estimate material quantities; the ability to stay calm during emergencies or dangers; and the ability to use hands, arms, and fingers to handle tools or operate machines (Doc. 7-1, p. 55/341).

The VE further testified that it is usual for a person to get three breaks per day–two 15 minute breaks and a meal break of 30 to 60 minutes (Doc. 7-1, p. 55/341). Longer break times are not generally available in the workplace (Doc. 7-1, pp. 55/341). Also, there is no accommodation for a person who may need to lie down during the day at the work and constructions sites involved in those jobs (Doc. 7-1, pp. 56/341). The jobs listed involve an expectation that a certain amount of work will be done during the day, even if there is no production quota or job time-limit (Doc. 7-1, pp. 56/341). Therefore, if an employee is off task occasionally (up to 1/3 of the day), that

---

[1] These jobs do not appear to exist in significant numbers in either the national or local economies. The term "significant numbers" is defined loosely by negative implication: "Isolated jobs that exist only in very limited numbers in relatively few locations outside the region where you live are not considered 'work which exists in the national economy.'" See 20 C.F.R. § § 404.1566(b) and § 416.966(b).

is an excessive amount of time for the employee to not be working and he would be let go (Doc. 7-1, pp. 56/341).

The ALJ posed a hypothetical to the VE that involved a person of Bellard's age, education, and work experience, who can do light work, can occasionally stoop, balance, kneel, crouch, and crawl, and can never reach overhead with either arm (Doc. 7-1, pp. 57/341). The VE testified that such a person could work as a cashier II (DOT 211.462-010, 3,354 jobs in the United States, 64,000 jobs in Louisiana); or a sales attendant (light work, SVP 2, DOT 299.677-010, 4,155,000 jobs in the United States and 59,000 jobs in Louisiana) (Doc. 7-1, pp. 57/341).

The ALJ posed an additional qualification to his hypothetical, that the person can only stand 45 minutes to an hour and then have to sit for 15 minutes to an hour before he resumes standing (Doc. 7-1, pp. 57/341). The VE testified there would not be any jobs such a person could perform (Doc. 7-1, pp. 57/341). The VE said such a person would not be able to do any of the supervisory positions he had identified (Doc. 7-1, pp. 58/341).

D.   **ALJ's Findings**

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Bellard (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at

11

any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Bellard has not engaged in substantial gainful activity since his alleged onset date of July 15, 2013, and his disability insured status expired after December 31, 2013 (Doc.7-1, p. 17/341).  The ALJ found Bellard has a severe impairment of a herniated disc at T10-11 (Doc.7-1, p. 17/341), but he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc.7-1, p. 19/341).  The ALJ also found Bellard was unable to perform his past relevant work[2] (Doc.7-1, p. 24/341).

The ALJ further found that Bellard has the residual functional capacity to perform the full range of medium work (Doc.7-1, p. 19/341).   The ALJ found that

---

[2] The ALJ misquoted the VE.  The ALJ stated Bellard cannot do his past work as a "sheet metal shop supply worker," DOT 809.130-014 because it was heavy to very heavy work (Doc. 7-1, p. 24/341).  However, the VE testified Bellard's past work was as a "sheet metal shop supervisor," DOT 809.130-014, which is *medium* work (Doc. 7-1, p. 53/341).  The VE then qualified that by stating that, as Bellard actually performed that job, it was heavy to very heavy work.

Bellard was an individual closely approaching advanced age, with at least a high school education, and transferability of job skills was not relevant (Doc. 9-1, p. 24/341).  The ALJ found that Rule 203.22 of the Medical-Vocational Guidelines, 20 C.F.R. Part. 404, Subpart P, Appendix 2, directs a conclusion of "not disabled" (Doc.7-1, p. 25/341).

The ALJ concluded that Bellard was not under a disability from the alleged onset date of July 15, 2013 through December 31, 2013, the date last insured (Doc.7-1, p. 25/341).

## II.    Law and Analysis

### A.    The ALJ's conclusion that Bellard can do medium work is not supported by substantial evidence.

Bellard first contends the ALJ failed to develop the medical record by not requesting further clarification from the treating physicians when it was determined that their reports did not fully address a critical issue.  Bellard contends the reports from Dr. Ieyoub and Dr. Esses failed to address the issue of his residual functional capacity and the ALJ erred in failing to request residual functional capacity assessments from them.  Bellard also argues the ALJ's decision is not supported by substantial evidence because she relied on the opinion of a non-treating, non-examining State consultant instead of the treating physicians' opinions.

A claimant's impairments may cause physical or mental limitations that affect what he can do in a work setting.  Residual functional capacity is a medical assessment, based on all of the relevant evidence, of the work a claimant can perform despite his or her limitations.  See 20 C.F.R. §404.1545, §416.945.  Although the

burden of proof in a disability case is on the claimant to show that he is unable to perform his usual line of work, once that fact is established, the burden shifts to the Commissioner to show that the claimant is able to perform some other kind of substantial work available in the national economy. See Herron v. Bowen, 788 F. 2d 1127, 1131 (5th Cir. 1986); see also Babineaux v. Heckler, 743 F.2d 1065, 1067 (5th Cir. 1984). The Commissioner has the burden to establish a claimant's residual functional capacity. See Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).

For cases at the administrative law judge hearing level, the ALJ has the responsibility for deciding a claimant's residual functional capacity. 20 C.F.R. § 404.1546, § 416.946. The ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities when making his RFC determination. Social Security Ruling 96-8p. S.S.R. 96-8p provides that a residual functional capacity (RFC) "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." 1996 WL 374184, *1 (S.S.A. 1996).

The ALJ has a duty to develop the facts fully and fairly relative to an applicant's claim for disability benefits. See Ripley v. Chater, 67 F.3d 552, 557 (5th Cir.1995) (citing Pierre v. Sullivan, 884 F.2d 799, 802 (5th Cir. 1989); Kane v. Heckler, 731 F.2d 1216, 1219 (5th Cir. 1984)).

Usually, the ALJ should request a medical source statement describing the types of work that the applicant is still capable of performing. See Ripley, 67 F.3d at 557. The absence of such a statement, however, does not, in itself, make the record

incomplete. <u>Ripley</u>, 67 F.3d at 557.  In a situation such as the present one, where no medical statement has been provided, the Court's inquiry focuses on whether the decision of the ALJ is supported by substantial evidence in the existing record. <u>Ripley</u>, 67 F.3d at 557.

In finding Bellard can perform medium work, the ALJ relied on the opinion of an unnamed medical consultant who did not sign his assessment and disability determination (Doc. 7-1, pp, 66, 68/341).[3]  The assessment is electronically initialed, and the name of the consulting physician is not in the record.

---

[3] Contrary to the Social Security rules, instead of a signature, the person typed "LMW, MD 19" (Doc. 7-1, pp. 66, 68/341).  <u>See</u> Social Security Program Operations Manual System ("POMS"), DI 24501.001(B)(4), which provides:

<u>The Disability Determination Services (DDS) Disability Examiner (DE), Medical Consultant (MC), and Psychological Consultant (PC) Team, and the Role of the Medical Advisor (MA)</u>.

Signature responsibilities of the MC and PC.
The MC and PC:
  • Sign assessments and determinations; and
  • Indicate that his or her signature completes the medical portion of the disability determination.
An MC who is a physician takes responsibility for the medical portion of the determination, except in cases where a PC may perform this function.
A PC may perform this function when:
  • a mental impairment is the only impairment in the claim; or
  • there is a combination of a mental impairment with a physical impairment, but the mental impairment alone justifies a finding of disability.
The MC or PC who is taking responsibility for the medical portion of the determination signs the disability determination forms and all supporting documents relevant to the determination that require a signature.
In cases where there is evidence of mental and physical impairment(s), and a PC reviews the case, the PC evaluates only the mental impairment(s) and the MC evaluates the physical impairment(s).
In cases where the combination of physical and mental impairments may be equivalent to a medical listing, the MC and PC confer, both complete and sign an SSA-416 (Medical Evaluation), and one of the consultants takes overall responsibility to sign the rationale supporting the equivalence. For additional information on the SSA-416, see DI 24501.006.

The Commissioner's POMS requires the medical consultant or physician consultant who conducted the analysis and completed the residual functional capacity assessment form to sign the form, to attest that he or she is responsible for its content and that the medical consultant is a doctor, if the determination is less than fully favorable.  See Procedural Operations Manual §§ DI 24505.025(F)(4), DI 24510.060(A)(2)(a), and DI 24510.060(B)(4)(d); see also Wade v. Astrue, 2008 WL 4538997, at *2 (N.D. Ind. 2008).  Since the name of the doctor who authored that report is not provided, that report is considered unauthenticated.

The unnamed state agency medical consultant found Bellard can do medium work, and the ALJ adopted his findings, noting it was "the only medical opinion in the record" (Doc. 7-1, p. 23/341).  The ALJ erred in relying on an unauthenticated report from a non-examining consultant to find Bellard can do medium work.  "Medium work" is defined in 20 C.F.R. § 404.1567(c) and § 416.967(c) as:

> Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary work and light work.

In finding Bellard can do medium work, the ALJ reasoned that Bellard's complaints of back pain were not fully credible.  The ALJ stated there was no evidence that Bellard sought treatment for his back pain until September 4, 2013, when he saw Dr. Ieyoub (Doc. 7-1, p. 23/341).  However, the medical records clearly show that Bellard sought treatment from Dr. Ieyoub for his back pain in 2011 and 2012, also (Doc. 7-1, pp. 253, 259, 266/341).  Bellard received steroid injections and nerve blocks in 2011 and 2012.  Therefore, the ALJ's conclusion that Bellard's complaints of pain

are not fully credible is based on an error of fact.  The magnitude of that error undermines the ALJ's conclusions.

The ALJ also found that Bellard did not receive any treatment from October 29, 2013 to February 4, 2014, so he was apparently able to stretch his pain medications for that period of time and get by on low doses of medication.  However, Bellard had a steroid injection on October 29, 2013, which would have delayed the necessity for using his pain pills and patches.  Moreover, Bellard had a surgery consult during that time period, and may have obtained medication prescriptions there.

It is also noted that, in finding Bellard can do medium work, the ALJ should have found Bellard can do his past relevant work as a sheet metal shop supervisor.[4] The VE testified that is medium work as it is usually performed in the national economy, although it was heavy to very heavy work as Bellard actually performed it. Although plaintiff could not return to his past relevant work[5] as he actually performed it, he could perform the work as it is generally performed in the national economy.  Therefore, since the ALJ found Bellard can do medium work, she should

---

[4] The ALJ found Bellard was not able to do his past work as a sheet metal shop supervisor as he actually performed that work (Doc. 7-1, p. 24/341), but did not consider the work as it is performed in the national economy.

[5] Past relevant work" is defined in the regulations as the actual demands of past work or "[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy." See SSR 82–61, 1982 WL 31387, at *2; Jones v. Bowen, 829 F.2d 524, 527 n. 2 (5th Cir.1987); see also Copeland v. Colvin, 771 F.3d 920, 924 (5th Cir.2014) (a claimant may retain the capacity to perform her past relevant work either as he or she actually performed it or as ordinarily required by employers throughout the national economy).
.

have found he could return to his past relevant work and stopped at Step 4 of her analysis.

In any event, there is no evidence other than that of the unnamed, non-examining consultant that supports the ALJ's finding that Bellard could do medium work from July 15, 2013 through December 31, 2013.  The flaws in the ALJ's reasoning undermines her conclusions that Bellard's complaints of pain are not fully credible and that he can do medium work.  Accordingly, the ALJ's conclusion that Bellard is not disabled because he can do medium work is are not supported by substantial evidence.

Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decision is incorrect as a matter of law.  However, this does not entitle Bellard to a decision in his favor based upon the existing record.  The record is simply inconclusive as to whether Bellard can perform his past relevant work and as to whether there are any jobs existing in significant numbers in the national economy that Bellard can perform, given his true impairments.  Therefore, Bellard's case should be remanded to the Commissioner for further proceedings.

**B.    The "retrospective" medical evidence should be given careful consideration on remand.**

Next, Bellard contends the ALJ should have recognized the retrospective evidence (evidence developed after Date Last Insured) which was the strongest evidence on a critical issue.

While a retrospective opinion can prove the existence of a disability, the retrospective opinion must refer clearly to the relevant period of disability and not

simply express an opinion to the claimant's current status. Records describing a claimant's current condition cannot be used to support a retrospective diagnosis of disability absent evidence of an actual disability during the time of insured status. See McLendon v. Barnhart, 184 Fed. Appx. 430, 432 (5th Cir. 2006). Evidence of medical conditions—even per se disabling conditions—that became medically determinable after the date last insured must not be considered, and evidence establishing the degeneration of a condition after the expiration of a claimant's insured status is not relevant to the Commissioner's disability analysis. See Dominguez v. Astrue, 286 Fed. Appx. 182, 185 (5th Cir. 2008); see also Torres v. Shalala, 48 F.3d 887, 894 n. 12 (5th Cir. 1995); Likes v. Callahan, 112 F.3d 189, 191 (5th Cir. 1997) (properly corroborated retrospective medical diagnoses can be used to establish disability onset dates).

Dr. Esses's diagnosis of a large herniated disc and "very profound stenosis with nerve root compression" clearly refers to the disc herniation Bellard was suffering from prior to December 31, 2013. Dr. Esses's surgery simply confirmed the diagnosis and proved it was more severe than previously believed. The ALJ noted Dr. Esses's surgery, but did not mention that Dr. Esses had found a "large herniated disc" and "very profound stenosis with nerve root compression," where Dr. Ieyoub had previously believed there was only a small herniation with no stenosis or compression. Dr. Esses's findings support Bellard's complaints of pain prior to December 31, 2013.

That fact should be given careful consideration on remand.

Finally, Bellard complains the ALJ failed to obtain medical evidence to establish a disability onset date.  The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations.  SSR 83–20, 1983 WL 31249, at *1.  Factors relevant to this determination include the claimant's allegation concerning the onset date, work history, and the medical evidence.  See id. at *2. Among these factors, "[t]he medical evidence serves as the primary element in the onset determination."  See id.; see also Spellman v. Shalala, 1 F.3d 357, 361 (5th Cir. 1993).

Since the ALJ did not find Bellard was disabled, she was not required to determine a disability onset date.  Bellard's disability onset date can be determined on remand, if necessary.

## III.   Conclusion

Based on the foregoing, IT IS RECOMMENDED that Bellard's appeal be GRANTED, the final decision of the Commissioner be VACATED, and the case be REMANDED to the Commissioner for further proceedings consistent with the views expressed herein.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy

of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this _8th___ day of January, 2018.

Joseph H.L. Perez-Montes
United States Magistrate Judge